UNITED STATES of America

v.

Louis DAIDONE, Peter Argentina, Raymond Argentina, Robert Molinelli, and Alan Taglianetti, Defendants.

No. 92–CR–185.

United States District Court, E.D. New York.

June 26, 1992.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. (Jo Ann Navickas, Michael Considine, Asst. U.S. Attys., of counsel), Brooklyn, N.Y., for U.S.

**716**

Anthony Lombardino, Kew Gardens, N.Y., for defendant Louis Daidone.

David Breitbart, New York City, for defendant Raymond Argentina.

Gary Schoer, Syosset, for defendant Robert Molinelli.

James R. Froccaro, Port Washington, N.Y., for defendant Alan Taglianetti.

## MEMORANDUM—DECISION AND ORDER

BARTELS, District Judge.

### I. BACKGROUND

The defendants were tried before a jury pursuant to an indictment alleging against each of them the following three counts: Count One, conspiracy to commit bank robbery or larceny in violation 18 U.S.C. § 371; Count Two, bank larceny in violation of 18 U.S.C. § 2113(b); and Count Three, intentional use of a firearm during and in relation to crimes of violence, to wit, the crimes charged in Counts One and Two, in violation of 18 U.S.C. § 924(c). The indictment stemmed from the theft of approximately $1.2 million from a Rapid Armored Truck Company ("Rapid") armored truck on the morning of March 25, 1988 in Brooklyn, New York. On April 29, 1992, a jury returned a guilty verdict on Count One against the defendants Daidone, Raymond Argentina, Molinelli and Taglianetti. The jury returned not guilty verdicts on Counts Two and Three against these defendants and found defendant Peter Argentina not guilty on all counts.

Defendants Daidone, Raymond Argentina, Molinelli and Taglianetti now move for judgments of acquittal pursuant to Fed. R.Crim.P. 29, new trials pursuant to Fed. R.Crim.P. 33 and release on bail pending appeal pursuant to Fed.R.Crim.P. 38. Seven contentions are raised by these motions as follows: [1] all defendants assert that the evidence introduced at trial was insufficient to convict them; [2] Raymond Argentina contends that he was denied a fair trial in violation of the Fifth Amendment of the Constitution because of judicial bias, prejudice and hostility toward his counsel, David Breitbart; [3] all defendants contend that Juror No. 7 should have been excused from the jury for cause; [4] all defendants assert that the Court and government improperly engaged in a secret *ex parte* meeting concerning the Government's position on Juror No. 7; [5] defendant Molinelli claims that the jury's verdict was inconsistent and contrary to law in light of his testimony at trial; [6] all defendants claim error concerning admissibility of evidence concerning a prior plan to rob a Coin Devices Corporation ("CDC") armored truck; and [7] defendants Daidone, Raymond Argentina and Taglianetti argue that they should be released on bail pending appeal because they were convicted of a non-violent crime. Since one of the defendants uses this occasion to contend that he did not receive a fair trial under the Constitution, a written opinion by this Court is necessary.

### II. DISCUSSION

#### 1. *Sufficiency of the Evidence*

■ Under the above claim, the Court must "view the evidence in the light most favorable to the government and construe all possible inferences in its favor...." *U.S. v. Salerno,* 868 F.2d 524, 530 (2d Cir.1989), *cert. den.* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989) (internal quotations omitted). Furthermore, "[p]articipation in a criminal conspiracy need not be proven by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'" *Salerno,* 868 F.2d at 530 (internal quotations omitted). The testimony of government witness Anthony Guarino alone is sufficient to meet these standards. Guarino testified at length about the conspiracy to rob a Rapid armored truck which involved the five defendants and himself. In addition, tape recorded conversations that Guarino had with Daidone, Taglianetti and Molinelli corroborated certain portions of Guarino's testimony. A witness testified that he saw Raymond Argentina driving the stolen Rapid armored truck along Newel Street, Brooklyn, New York on the morning of March 25, 1988. Finally, the testimony of Molinelli, who took the stand

in his own defense, further corroborated much of what Guarino had said.

### 2. *Raymond Argentina's Claim of Judicial Bias, Prejudice and Hostility*

■ Raymond Argentina alone asserts that the district court denied him a fair trial in violation of the Fifth Amendment of the Constitution because the Court "openly expressed hostility toward Breitbart in the presence of the jury." Argentina speculates that the jury punished him with a conviction for the district court's "bias" and "ridicule and disdain of ... [his] ... counsel's actions." He offers several citations to the trial transcript in order to support his characterization of the "Court's ill feelings toward the defense." These quotations are taken out of context and parsed from the record. They present a wholly inaccurate depiction of what transpired during the course of this lengthy and hotly contested trial. A careful and thorough review of the trial transcript belies any accusation that the Court acted improperly toward Breitbart in spite of his efforts to induce such conduct.

Much to the contrary, Breitbart acted very improperly throughout the trial. He disregarded and/or contested many rulings after they had been made during the course of the trial at least twenty-one (21) times. Transcript ("Tr.") at 13–14, 60–61 and 1175–83, 151–52, 459–61, 552, 609–13, 623, 871, 1273, 1411–13; *compare* N.Y.Judiciary Law App. DR 7–106(A) (McKinney's Supp.1992) ("[a] lawyer shall not disregard ... a ruling of a tribunal made in the course of a proceeding...."). Breitbart suggested to the Court that it had made a certain ruling, when, in fact, it had recently made the opposite determination on at least two occasions. Tr. at 609–11, 61 and 1175–83; *compare* N.Y.Judiciary Law App. DR 7–106(A) and DR 7–102(A)(5) (McKinney's Supp.1992) ("[i]n the representation of a client, a lawyer shall not ... [k]nowingly make a false statement of law or fact"). He openly challenged the district court's power under Fed.R.Evid. 614(b) to ask questions of witnesses. Tr. at 1224; Fed. R.Evid. 614(b); *see e.g., Berkovich v. Hicks*, 922 F.2d 1018, 1025 (2d Cir.1991).

He pursued impermissible lines of questioning during cross-examination at least nine (9) times despite the Court's rulings to the contrary. Tr. at 552, 576, 609–13, 623; *compare* N.Y.Judiciary Law App. DR 7–106(A). He acted insubordinately and/or disruptively at least thirty-one (31) times. Tr. at 203, 258, 459–61, 609–11, 613, 693, 871, 1224, 1231–32, 1272–74, 1405, 1407, 1412–1413, 1428–30, 1433, 1832–33; *compare* N.Y.Judiciary Law App. DR–7–106(C)(6) (McKinney's Supp.1992) ("[i]n appearing as a lawyer before a tribunal, a lawyer shall not ... [e]ngage in undignified or discourteous conduct which is degrading to a tribunal"). He interjected his own commentary into the proceedings at least twelve (12) times. Tr. at 422–23, 572, 574–75, 611, 613, 624, 693, 871, 1407, 1412, 1414–15; *compare* N.Y.Judiciary App. DR 7–106(C)(1) (McKinney's Supp.1992) ("[i]n appearing as a lawyer before a tribunal, a lawyer shall not ... [s]tate or allude to any matter that he or she has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence") and DR 7–106(C)(6). Based on this misconduct, the Court did not exaggerate when it stated to Breitbart at sidebar that, "I don't know how to deal with you. I've never had anyone like you in my Court in 32 years—nobody—but nobody." Tr. at 1430.

Breitbart was warned at least seven (7) times that if he did not stop acting in the ways described above he would be rebuked or barred from proceeding. Tr. at 614, 623–24, 625, 648–49, 684, 783–87, 788. The Court admonished him in light of these warnings and only in direct response to his misconduct. Many of these reprimands occurred outside the presence of the jury. For those which did not, Breitbart knowingly defied the specific warning that he would be rebuked in front of the jury if necessary. Tr. at 648–49.

For example, while Raymond Argentina points to a particular exchange of words between Breitbart and the Court in front of the jury as the "nadir" of the latter's bias, the transcript shows instead that Breitbart's misconduct alone precipitated the

reprimand. The Court rebuked Breitbart after he made a frivolous objection concerning the evidentiary requirements of refreshing the recollection of defendant Molinelli during cross-examination. Tr. at 1412–13. Moments before, the Court had already ruled on the same frivolous objection after a lengthy colloquy with James Frocarro, Taglianetti's lawyer. The relevant dialogue reads in the following manner (Tr. at 1411–13):

Q [by Mr. Considine]: Let me see if we can refresh your recollection. Transcript dated May 7, 1990. I'll direct your attention to page 3.

MR. FROCARRO: Judge, we have never seen his version of the transcript. I don't know what he may have created on that transcript. I don't think it's fair.

THE COURT: Is that a transcript?

MR. CONSIDINE: It's a transcript. I can use it to refresh his recollection. Does he want to take a look at it? He's welcome to take a look at it.

THE COURT: He can take a look at it. (Pause.)

MR. FROCARRO: Judge, before he shows this to the witness, because there's a big difference in our interpretation and his interpretation. He's refreshing with something that's misleading.

THE COURT: That's up to him.

MR. FROCARRO: Judge, he hasn't had a chance to hear the tape. It's totally unfair. Let him play the tape.

THE COURT: Wait a minute. I don't know how many cases you have tried. You can give him a telephone book and ask him if it refreshes his recollection.

MR. FROCARRO: Can we give him our version of the transcript also?

THE COURT: No. This is only to refresh his recollection. No.

MR. FROCARRO: It's not an accurate transcript.

THE COURT: Do you understand the ruling?

MR. FROCARRO: I understand it. It's a critical ruling.

THE COURT: It's a right ruling.

MR. CONSIDINE: Judge, this is improper.

THE COURT: Of course it's improper.

MR. FROCARRO: It's not improper.

THE COURT: I say it is, and, unfortunately for you, my ruling governs. Please sit down.

MR. FROCARRO: I will defer to your Honor. If you listen to the tape—

THE COURT: Please sit down.

MR. CONSIDINE: Does this refresh your recollection?

THE COURT: That's all he's asking.

MR. BREITBART: He read it first. He created a document. He read it out loud.

MR. CONSIDINE: It's totally proper.

MR. BREITBART: He can't say out loud anything he wants, and he's already done that, Judge.

THE COURT: I don't know whether I ought to resign and let them take over or not.

Q [by Mr. Considine]: My question to you, Mr. Molinelli, was:

Do you recall, without looking at this transcript at this particular moment, Mr. Guarino saying to you: What they wanted is—

MR. BREITBART: Objection.

THE COURT: Overruled. You don't represent him anyway.

MR. BREITBART: I represent one of the defendants charged in this case. If he's doing something improper I have a right to object.

THE COURT: I know. You have too many rights, I think.

MR. BREITBART: May the record reflect that you are talking to me when you said that.

THE COURT: Yes. I'm talking to you. Your name is Mr. Breitbart and I'll talk to you again. You're interfering with the administration of justice. You have done it all along.

MR. BREITBART: What?

THE COURT: You heard what I said. Go ahead and ask him the question.

The Court's rebuke was a direct response to Breitbart's refusal to accept a ruling made to Frocarro just moments earlier. Furthermore, Breitbart deceptively stated to the Court that the prosecutor, Michael

Considine, had "read ... [the document] ... out loud," when, in fact, he had not. Tr. at 1411–1413. This type of behavior had occurred throughout the trial, and Breitbart had received warnings. The transcript reveals that the Court harbored no bias or prejudice against Breitbart or the defendant Raymond Argentina when read fully in context. In addition, it is undisputed that the Court's statement was directed at Mr. Breitbart, and not his client.

■ The responsibility rests with the district court to conduct an orderly trial, supervise the conduct of attorneys, control the mode and order of interrogating witnesses and presentation of evidence, and keep the proceedings moving along in a reasonable manner. As the First Circuit has aptly stated, "federal trial judges are not puppets; they are expected—indeed they are duty-bound—to maintain proper decorum and order in the courtroom." *Campana v. Eller*, 755 F.2d 212, 216 (1st Cir.1985). Reprimanding Breitbart at certain times during the trial was a regrettable but completely necessary exercise of these duties. Raymond Argentina's argument must fail because it assumes that federal trial judges have no affirmative obligation to take corrective action in the face of a pattern of misconduct and contumacious behavior by counsel. Under Raymond Argentina's theory, federal trial judges might as well be replaced with puppets because any attempt to regulate an attorney's misconduct with a reprimand could be parried with a claim of judicial bias.

The Second Circuit has repeatedly held that "misconduct by defense counsel may be properly taken into account ... in determining whether a defendant was prejudiced by the judge's response." *U.S. v. Robinson*, 635 F.2d 981, 985 (2d Cir.1980), *cert. den.* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852 (1981); *U.S. v. Mickens*, 926 F.2d 1323, 1327 (2d Cir.1991), *cert. den. Mickens v. U.S.*, — U.S. —, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992) ("remarks were provoked to some extent by one defense counsel's despicable verbal assault on the court"); *U.S. v. Roldan–Zapata*, 916 F.2d 795, 807 (2d Cir.1990), *cert. den. Roldan–Zapata v. U.S.*, — U.S. —, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991) ("the judge's comments in front of the jury, even if at times stern or sarcastic, were appropriate responses to counsel's improper questioning of witnesses, inappropriate requests and disrespectful gestures"); *U.S. v. Pisani*, 773 F.2d 397, 403–04 (2d Cir.1985) ("some ... comments were provoked by counsel's continuing to do things that the court had specifically cautioned him to avoid...."). Under these precedents, Raymond Argentina cannot avail himself of the Court's rebukes against his counsel's inexcusable pattern of gross misconduct exhibited during the trial. Even setting Breitbart's provocative misconduct aside, Raymond Argentina was not prejudiced by any of the Court's reprimands because they had nothing to do with the merits of the case. *U.S. v. Di Tommaso*, 817 F.2d 201, 220 (2d Cir.1987) ("rebukes of defense counsel reflected not upon the merits of the case but rather on the way it was handled"). Furthermore, the jury was instructed during the charge that "[y]ou should not allow any prejudice against the attorney or his client because the attorney objected to the admissibility of evidence or asked the [sic] conference at the sidebar out of the hearing of the jury or asked the Court for a ruling on the law." Tr. at 1837. The jury was also charged that, "[a]nything that ... [the Court] ... said during the trial of this case ... is not to be substituted for your own recollection of the evidence. It is you that are the sole judges of the facts and of the evidence in this case." Tr. at 1838. Thus, the Court finds that Raymond Argentina received a fair trial in spite of his defense counsel's pattern of provocative misconduct.

### 3. *Denial of Motions to Excuse Juror No. 7*

■ During the trial, a juror handed the Court Deputy a newspaper clipping taken from *Newsday* which stated that, "[t]here is no reason for this abusive delay which has been compounded by last-minute attempts to manipulate the judicial process." *See* App. A. The clipping was a quotation

from the April 21, 1992 decision in *Gomez v. United States Dist. Court,* ——— U.S. ———, 112 S.Ct. 1652, 118 L.Ed.2d 293 (1992) as reported in *Newsday.* It contained no direct reference to the instant trial. Several days later, based on the Court Deputy's recollection that Juror No. 7 handed him the clipping, the defendants moved to have Juror No. 7 removed for cause. This application verged on the frivolous and clearly falls within the category of *de minimus non curat lex.* Although there was no necessity to pursue the matter, the Court nevertheless conducted an *in camera voir dire* of Juror No. 7 in order to determine whether she could still render a fair and just verdict. Tr. at 1705–09. A court reporter transcribed the interview.

Juror No. 7 explained that the clipping was given to the Deputy as a "joke" to make light of the fact that "we've been sitting around for so long.... [E]very time we come early and we sit there for 45 minutes and wait." Tr. at 1706. Juror No. 7 stated that the clipping had "nothing to do with anything," and that she remained absolutely impartial. Tr. at 1706. Finally, she indicated that while she had not given the clipping to the Court Deputy, she agreed with the other jurors that it should be "put up on the wall." Tr. at 1708. The Court concluded that there was no basis to excuse Juror No. 7 for cause because the clipping was a joke and she continued her pledge to render an impartial verdict in the case. Similarly, the Court concluded that there was no reason to engage in further inquiry with other jurors about the clipping.

Raymond Argentina asserts that the clipping was used by the jurors as a reference to Breitbart's behavior at trial or the Court's response to it. This is unfounded speculation. Juror No. 7 specifically stated that the clipping had "nothing to do with anything" except for the many delays in starting the proceedings each morning. Tr. at 1706. The jurors, many of whom travelled long distances early in the morning each day, sat idly in the juryroom during these times as they waited to be summoned into the courtroom. Their frustration was understandable, but clearly had nothing to do with Breitbart's behavior or the Court's response to it during the proceedings.

#### 4. *Alleged Secret Ex Parte Meeting Concerning Juror No. 7*

The defendants erroneously contend that the Court had a secret *ex parte* discussion with the government on the evening prior to the Court's interview with Juror No. 7. The record indicates that the government told the Court and defense counsel that it would call Chambers concerning its position on the matter that evening or early the next morning. Tr. at 1699, 1702–1703, 1710, 1832–33. The record clearly shows that defense counsel was well aware of that fact and that no objection was made. In any event, the Court's decision to deny the motions to excuse Juror No. 7 was based exclusively on the basis of its *in camera voir dire* of her.

#### 5. *Molinelli's Claim of Inconsistent Verdicts*

■ Robert Molinelli argues that the verdict was inconsistent because the jury could not have found him guilty of conspiracy without also finding him guilty of the substantive crimes charged. Such a conclusion requires second-guessing the jury's assessment of the evidence. Assuming *arguendo* that the jury's verdict is inconsistent, which it is not, such inconsistency does not provide a basis for acquittal or retrial. *U.S. v. Powell,* 469 U.S. 57, 64–69, 105 S.Ct. 471, 476–79, 83 L.Ed.2d 461 (1984); *U.S. v. Chang–An–Lo,* 851 F.2d 547, 559–60 (2d Cir.1987), *cert. den. Chang–An–Lo v. U.S.,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988).

#### 6. *Introduction of Coin Devices Corporation ("CDC") Evidence*

■ After extensive pre-trial briefing and argument, the Court granted the government's motion *in limine* to introduce certain evidence through Guarino concerning a prior conspiracy to rob a CDC armored truck. The defendants claim that the decision was erroneous. Defendant

Molinelli, who had nothing to do with plans to heist a CDC truck, claims prejudicial spillover. Guarino's CDC conspiracy testimony was admissible against the defendants other than Molinelli under Fed. R.Evid. 404(b) because it served to inform the jury about the background to the Rapid conspiracy and to help explain how the illegal relationship among some of the participants developed. *U.S. v. Coiro*, 922 F.2d 1008, 1015–16 (2d Cir.1991), *cert. den.* — U.S. —, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *U.S. v. Roldan–Zapata*, 916 F.2d 795, 804 (2d Cir.1990), — U.S. —, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). The jury was instructed to consider the CDC evidence against these defendants, if at all, only for these limited purposes. Tr. at 1894–95. Since Molinelli was not connected to the CDC plan, the Court specifically instructed the jury during the trial and in the charge not to consider the CDC similar act evidence "in any way" against him. Tr. at 341–42, 1894. Molinelli was not prejudiced by the CDC evidence in light of these instructions. *U.S. v. Cervone*, 907 F.2d 332, 341–42 (2d Cir.1990), *cert. den. Bernesser v. U.S.*, — U.S. —, 111 S.Ct. 680, 112 L.Ed.2d 672 (1991).

### 7. *Applications For Bail Pending Appeal*

■ Defendants Daidone, Raymond Argentina and Taglianetti argue that they should be released pending appeal because they were convicted of conspiracy to commit bank robbery or larceny. 18 U.S.C. § 3142(f)(1)(A) and § 3143(a)(2) provide that when a defendant is convicted of a "crime of violence," the defendant shall be detained unless the Court determines that there is a "substantial likelihood" that a motion for a new trial or acquittal will be granted. 18 U.S.C. § 3142(f)(1)(A) and § 3143(a)(2). Conspiracy to commit armed bank robbery can be a crime of violence under these statutes. *U.S. v. Chimurenga*, 760 F.2d 400, 404 (2d Cir.1985); *see also U.S. v. Patino*, 962 F.2d 263, 267 (2d Cir. 1992). This conspiracy was a crime of violence because evidence showed that the defendants contemplated use of or access to a shotgun under Molinelli's control. Release pending sentence and appeal must be denied as a matter of law under these circumstances. Assuming *arguendo* that the conspiracy is not a crime of violence, the applications nonetheless fail under 18 U.S.C. § 3143(a)(1). After a lengthy detention hearing, Magistrate Judge Chrein found that the defendants were a danger to the community. The defendants never appealed this specific finding and it remains accepted by this Court.

### III. CONCLUSIONS

The Court has carefully considered the merits of the defendants' motions. For the reasons stated above, all motions are hereby DENIED.

SO ORDERED.

APPENDIX   A

'There is no good reason
for this abusive delay,
which has been
compounded by last-minute
attempts to manipulate the
judicial process.'

—Supreme Court's unsigned ruling